**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| (1) NATASHA DODSON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>(1) MIKE REED, in his official capacity, )<br>(2) JENNIFER EASTWOOD, )<br>)<br>)<br>Defendants. ) | Case No. 18-CV-00221-TCK-FHM<br><br>Jury Trial Demanded<br>Attorney Lien Claimed |

**AMENDED COMPLAINT**

COMES NOW the Plaintiff, Natasha Dodson ("Dodson" or "Plaintiff"), and for her Amended Complaint against the Defendants, alleges and states, as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Dodson is a resident of Mayes County, Oklahoma.

2. Defendant Mike Reed ("Sheriff Reed") is, and was at all times relevant hereto, the Sheriff of Mayes County, Oklahoma, residing in Tulsa County, Oklahoma and acting under color of state law. Defendant Reed, as Sheriff and the head of the Mayes County Sheriff's Office ("MCSO"), was, at all times relevant hereto, responsible for ensuring the safety and well-being of inmates detained and housed at the Mayes County Jail,  In addition, Sheriff Reed is, and was at all times pertinent hereto, responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of MCSO and the Tulsa County Jail, including the policies, practices, procedures, and/or customs that violated Plaintiff's rights as set forth in this Amended Complaint.

3. Sheriff Reed is sued purely in his official capacity.  A claim against a state actor in his official capacity, such as Sheriff Reed, "is essentially another way of pleading an action against the

-1-

county or municipality" he represents and is considered under the standard applicable to 1983 claims against municipalities or counties. *Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010). *See also Kentucky v. Graham,* 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). As the elected Sheriff, Sheriff Reed is, in essence, a governmental entity.

4. Defendant Jennifer Eastwood was at all times hereto an employee or agent of MCSO / Mayes County, whose acts, or omissions to act, gave rise to the claims herein.

5. The jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

6. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and the laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial District.

## FACTUAL ALLEGATIONS

8. On or about February 26, 2014, Dodson was involved in a single vehicle accident on State Highway 82 near Strang Road.

9. The accident was investigated by Oklahoma Highway Patrol Trooper Colby Overstreet.

10. After searching Ms. Dodson's person and purse, Trooper Overstreet recovered a small amount of contraband and paraphernalia.

11. Trooper Overstreet arrested Dodson on the basis of driving under the influence, possession of narcotics and paraphernalia. He took her into custody and transported her to the Mayes County Jail.

12. Dodson did not resist arrest and cooperated with Trooper Overstreet.

13. Upon arriving at the Jail, the Trooper escorted Dodson to the booking area where Dodson encountered a number of officers, including but not limited to Jennifer Eastwood and Dereck Davis.

14. Upon information and belief, Dodson was frisked by a deputy and no weapons or contraband were found on her body. Dodson requested a phone call and to use the restroom and was told she needed to wait.

15. Dodson was escorted to the booking bathroom by Officer Eastwood, wherein Eastwood demanded that Dodson remove her clothing for a strip search.

16. There was no probable cause or reasonable suspicion to conduct the strip search.

17. Dodson became upset and began crying and asked Eastwood if she could use the restroom because she was menstruating; however, she was not combative. Eastwood continued to demand Dodson to remove her clothing.

18. Officer Eastwood became aggressive with Dodson and told her if she did not remove her clothing, she would shoot her.

19. At no time did Dodson actively resist, but rather, passively resisted the unconstitutional strip search.

20. Officer Eastwood, pulled a gun on Dodson, now known to be a "JPX Jet Protector" pepper gel spray gun, and held it approximately twelve (12) inches from Dodson's face and told her if she did not remove her clothing, she would shoot her and began counting down.

21. Eastwood told Dodson she can ask three times before I shoot. Eastwood asked one more time and then pulled the trigger of her gun; however, the gun did not fire.

22. Eastwood called out to Davis to have her bring another cartridge for her gun. Davis did bring her another cartridge.

23. Upon receiving another cartridge from Davis, Eastwood loaded the JPX Jet Protector and shot Dodson, within inches of her face, in the eye with pepper gel.

24. The force of the shot knocked Dodson to the ground and caused her to become unconscious.

25. When Dodson became conscious, she was lying on the floor of the room where she was shot and was naked being sprayed with water by Eastwood.

26. Dodson was bloody and was in severe pain.

27. An inmate uniform was placed on Dodson and she was escorted to a detox jail cell where she remained until the next morning. Dodson was merely awaiting bail; she was not to be detained for a long period of time or maintained in the general population of the jail. The next morning Dodson was escorted to a different cell where she stayed for a few hours and was taken to an office where a nurse asked Dodson if she could see. Dodson said "no" and the nurse responded, "yeah you can your pupil is dilating". Dodson was taken back to her cell and was given an ice pack for her eye.

28. Dodson remained in the cell until she saw a judge in the afternoon and posted bond and was released.

29. Dodson was not given any medical treatment for her injuries while she was in custody.

30. On or about February 27, 2014 at 2:24 p.m., Dodson was released from custody.

31. Deputy Eastwood's use of the pepper gun and strip search was excessive and unreasonable given the circumstances. Eastwood's use of the JPX Jet Protector was in violation of the manufacturer's user / training manual and MCSO written policy.

32. At the time of the incident in question, MCSO had enacted the following Strip Search written policy, which reads in pertinent part:

### POLICY

The Mayes County Jail Facility strives to protect and preserve the dignity and civil rights of all pre-trial detainees and convicted inmates to the greatest extent possible while ensuring the security of the facility and safety of the personnel and other inmates. Strip searches will only be conducted in the appropriate circumstances and in accordance with written procedure.

### PROCEDURES

1. **Reasonable Suspicion Required:** No strip search will be performed on any arrestee or inmate unless a Jail Facility Officer has reasonable suspicion that the person possesses a weapon or contraband. Reasonable suspicion may be based on factors such as:
- Nature of offense charged
- Arrestee's appearance and conduct
- Prior arrest record

**Reasonable suspicion may not be based solely on the nature of the offense charged.**

2. **Notify Shift Officer:** Once the Jail Officer has formed a basis for reasonable suspicion that a detainee/inmate has contraband or a weapon concealed on his or her person, the Jail Officer will notify the Shift Officer. The Shift Officer must give approval in writing before a strip search may be performed.

3. **Search Procedure:** The following procedure will be used when conducting strip searches:
- Instruct inmate to remove all clothing
- Instruct inmate to brush out hair with hands
- Instruct inmate to stand facing Officer with arms extended outward from his or her body
- Visually inspect anteriorly of the body for any marks, bruises, cuts, lacerations, or contraband

- Instruct inmate to turn his or her back to the Office, arms extended outward from his or her body
- Visually inspect posteriorly of body for any marks, bruises, cuts, lacerations, or contraband
- Instruct inmate to raise feet and visually inspect soles for marks, bruises, cuts, lacerations or contraband
- Instruct inmate dress in provided standard jail facility uniform
- Inventory inmate's clothing, exercising caution to avoid being cut by concealed sharp instruments, and place in inmate's locker

4. **<u>Incident Report:</u>** The Officer who performs the strip search will immediately prepare a written incident report. The incident report will document:
- The factors which support the determination of reasonable suspicion
- A description of the search
- Detailed description of any contraband found
- any other unusual or notable occurrences

**The Incident Report must be signed by both the Shift Officer and the Jail Officer conducting the search.**

5. **<u>Prohibited Actions:</u>** The following prohibitions must be observed during a strip search:
- Officers will not touch an inmate's body
- Officers will not search an inmate's body cavities or body orifices
- Officers will not make personal remarks regarding the inmate's personal or physical characteristics
- No other inmates will be present

33. At the time of the incident in question MCSO had enacted the following Use of Force / Deadly Force policy, which reads in pertinent part:

### 4.08.4  POLICY

Every reasonable effort will be made to prevent any situations which require the use of force.  If at all possible, non-forceful means (verbal intervention, negotiation, show of force, etc.) will be attempted before using force as a last report.  Verbal provocation alone will not justify the use of physical for[c]e.
The use of any type of force for punishment or reprisal, or which is unnecessary or excessive, is strictly prohibited.  The amount and type of force used will be the least possible and then only as a last resort, consistent with the safety of the public, staff and inmates.

Personnel will [*sic*] authorized to use force only if the employee has successfully completed training its use.

### 4.08.5  PROCEDURES

When negotiations have been utilized or found to be impractical, use of force is justified to maintain or restore safety, security and control.  The method(s) of force employed will be most practical and humane under the circumstances.

The following are the specific types of force allowed and applicable procedures:

…

**C.  INFLAMMATORY AGENTS**

1.  INFLAMMATORY AGENTS (products such as Oleoresin Capsicum Pepper Spray and Oleoresin Capsicum/CS Pepper Grenades) MAY BE USED IN THE FOLLOWING SITUATIONS:

- In self-defense and in defending the general public, staff and inmates such as:
- To prevent or quell a disturbance
- To enforce regulations and/or orders in which violation of may threaten security and safety
- To prevent or halt damage to property
- To prevent escape

2.  The amount of force used in the use of inflammatory agents will be no more than is necessary to control the situation.

3.  Inflammatory agents will only be used by staff that has successfully completed training in its use.

Inflammatory agents will not be carried by individual staff into inmate contact living areas. Placement of inflammatory agents in contact inmate living areas shall require the approval of the Jail Administrator/designee.  Inflammatory agent spray will be weighed and logged upon reception, quarterly, and after each use.  Upon expiration the Jail Administrator/designee will ensure proper disposal.  When no in use inflammatory agents will be stored in Central Control.

34. Prior to Dodson being taken into custody of the County, Sheriff Reed failed to:

   a) Create, implement, and enforce proper policies and procedures relating to the use of the JPX Jet Protector;

    b) Provide proper and adequate training and supervision to Sheriff Officers, including but not limited to Deputy Eastwood and Davis, regarding the proper use of the JPX Jet Protector;[1]

    c) Create, implement, and enforce policies relating to the use of excessive force; and

    d) Provide proper and adequate training and supervision to Sheriff Officers, including but not limited to Deputy Eastwood and Davis, regarding excessive force.

35. Sheriff Reed / MCSO knew and/or reasonably should have known that those taken into custody by the MCSO were subjected to and/or unreasonably at the risk of being subjected to excessive force and danger.

36. Sheriff Reed / MCSO knew and/or reasonably should have known that its training with respect to the use of the JPX Jet Protector was inadequate and substantially certain to result in Constitutional violations.

37. Upon information and belief, Sheriff Reed / MCSO had knowledge of other inmates asserting verifiable claims of being subjected to excessive force and danger while at the Jail.

38. Sheriff Reed / MCSO failed to take reasonable measures to alleviate the risks of harm faced by inmates like Dodson.

39. As a direct and proximate result of the Defendants' conduct, actions, and/or inactions the Plaintiff has suffered severe personal injuries, medical expenses, pain and suffering, mental anguish, and lost wages.

---

[1] More specifically, discovery has revealed that MCSO failed to train its officers: (A) regarding the appropriate distance (7 feet from the suspect) for safe use of the JPX Jet Protector according to the manufacturer warnings; (B) that the JPX Jet Protector could cause permanent injury or death; (C) how to use the JPX Jet Protector in compliance with MCSO use of force policies; and (D) that JPX Jet Protector should never be used as a compliance tool on inmates who are passively resisting commands. On the contrary, discovery has revealed that, in violation of MCSO policy, manufacturer warnings and the United States Constitution, MCSO trained its officers, including Eastwood, that it is appropriate to use the JPX Jet Protector as a "compliance tool" on inmates who pose no threat of harm to anyone and who merely passively resist commands.

## CAUSE OF ACTION
## VIOLATION OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
## (42 U.S.C. § 1983)

### A. UNDERLYING VIOLATIONS OF THE CONSTITUTION

40. Plaintiff incorporates the allegations set forth in paragraphs 1 through 39, as if fully set forth herein.

41. When Dodson was taken into the care and custody of the MCSO a special relationship was created whereby an affirmative duty existed to ensure the protection, safety, and well-being of Dodson. Such duty existed at the time Dodson was taken into custody and extended through the entire time until she was released.

42. No reasonable suspicion existed to support the fact that Dodson possessed any type of contraband or drugs on her body. Despite no reasonable suspicion existing, Eastwood demanded that Dodson submit to a strip search.

43. Defendant Eastwood's use of an inflammatory agent, through close range use of the JPX Jet Protector, to the eyes of Dodson was unreasonably excessive and exceeded the amount and type of force necessary to meet the need presented.

44. Defendant Eastwood's use of an inflammatory agent to the eyes of Dodson, through close range use of the JPX Jet Protector, was excessive as it was not committed in self-defense, in defense of the general public, staff, or inmates. Eastwood was not attempting to prevent an escape or damage to property. Further, Eastwood was not attempting to prevent a disturbance within the jail or to ensure the security or safety of others.

45. Eastwood inappropriately used the JPX Jet Protector in an unsafe manner as a "compliance tool" at a time when Dodson posed no threat to anyone and was only passively resisting the unconstitutional demand that she submit to a strip search.

46. Defendant Eastwood's use of an inflammatory agent under the circumstances was excessive, objectively unreasonable, in violation of Dodson's Fourteenth Amendment rights, and the proximate cause of severe and permanent injury to Dodson.

47. After Dodson suffered severe and obvious personal injury from the use of excessive force, Eastwood, and all other MCSO employees who came into contact with Dodson, failed to provide her with the necessary and proper medical treatment, in deliberate indifference to her serious and obvious medical needs.

48. As a proximate cause of these violations of Dodson's federally protected rights, Dodson endured severe pain, suffering, mental pain and anguish, permanent injury, lost wages and the damages sought herein.

### B. Official Capacity Liability

49. Plaintiff incorporates the allegations set forth in paragraphs 1 through 49, as if fully set forth herein.

50. The aforementioned underlying violation of Dodson's Constitutional right to be free from excessive use of force is causally connected with official policies and/or customs which the Mayes County Sheriff promulgated, created, implemented and/or possessed responsibility for.

51. Prior to Dodson being taken into custody of the County, Sheriff Reed failed to:

    a) Create, implement, and enforce proper policies and procedures relating to the use of the JPX Jet Protector;

    b) Provide proper and adequate training and supervision to Sheriff Officers, including but not limited to Deputy Eastwood and Davis, regarding the proper use of the JPX Jet Protector;[2]

---

[2] More specifically, discovery has revealed that MCSO failed to train its officers: (A) regarding the appropriate distance (7 feet from the suspect) for safe use of the JPX Jet Protector according to the manufacturer warnings; (B) that the JPX Jet Protector could cause permanent injury or death; (C) how to use the JPX Jet Protector in compliance with MCSO use of force policies; and (D) that JPX Jet Protector should never be used as a compliance tool on inmates who are passively resisting commands. On the contrary, discovery has revealed that, in violation of

      c) Create, implement, and enforce policies relating to the use of excessive force; and

      d) Provide proper and adequate training and supervision to Sheriff Officers, including but not limited to Deputy Eastwood and Davis, regarding excessive force.

52. Sheriff Reed / MCSO knew and/or reasonably should have known that those taken into custody by the MCSO were subjected to and/or unreasonably at the risk of being subjected to excessive force and danger.

53. Sheriff Reed / MCSO knew and/or reasonably should have known that its training with respect to the use of force, and specifically the JPX Jet Protector, was inadequate and substantially certain to result in Constitutional violations.

54. Upon information and belief, Sheriff Reed / MCSO had knowledge of other inmates asserting verifiable claims of being subjected to excessive force and danger while at the Jail.

55. Sheriff Reed / MCSO failed to take reasonable measures to alleviate the risks of harm faced by inmates like Dodson.

56. The Mayes County Sheriff, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent to inmates', including Dodson's, health and safety.

57. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Dodson suffered injuries and damages as alleged herein.

---

MCSO policy, manufacturer warnings and the United States Constitution, MCSO trained its officers, including Eastwood, that it is appropriate to use the JPX Jet Protector as a "compliance tool" on inmates who pose no threat of harm to anyone and who merely passively resist commands.

WHEREFORE, based on the foregoing, Plaintiff prays this Court grant the relief sought, including but not limited to actual and compensatory damages, and punitive damages, in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

/s/Robert M. Blakemore
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
Smolen & Roytman
701 South Cincinnati Avenue
Tulsa, OK 74119
(918) 585-2667
(918) 585-2669 Fax
danielsmolen@ssrok.com
bobblakemore@ssrok.com
bryonhelm@ssrok.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 16th day of March 2020, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.

/s/ Robert M. Blakemore