## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

NATASHA DODSON                          )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )            Case No. 18-CV-221-TCK-CDL
                                        )
MIKE REED, in his official capacity;    )
JENNIFER EASTWOOD,                      )
                                        )
            Defendants,                 )

## <u>OPINION AND ORDER</u>

Before the Court is the Motion for Summary Judgment filed by defendant Mike Reed, in his official capacity as Sheriff of Mayes County Doc. 103 ("Reed" or "Sheriff").  In his motion, Reed argues that no policy, procedure or custom implemented by him in his official capacity caused any alleged violation of any constitutional rights of plaintiff Natasha Dodson ("Dodson").

Dodson opposes Reed's motion.  Doc. 126.

**I. Background**

Following a single-vehicle rollover accident on February 26, 2014, Dodson was arrested for driving under the influence, and subsequently transported and booked into the Mayes County Jail.  During the booking process, Officer Jennifer Eastwood ("Eastwood") conducted a search of Dodson's purse, in which she found a metal pipe and a container with multiple pills, one of which was identified as Lortab.  Thereafter, Eastwood took Dodson into a bathroom near the jail's booking area, and told her that a strip search was mandatory. After attempting unsuccessfully to

handcuff Dodson, Eastwood deployed a Jet Protector ("JPX")[1] toward Dodson's face, and then conducted the search. Dodson was released the following day.

In her Amended Complaint, Dodson asserts a claim against Eastwood for violation of her Fourteenth Amendment rights under 42 U.S.C. §1983 (Count A) and a claim against the Sheriff for official capacity liability (Count B). Doc. 69.   She seeks actual, compensatory and punitive damages for, *inter alia*, physical torture, abuse, pain, suffering, mental pain and anguish, loss of capacity and medical expenses. *Id.*

Reed seeks summary judgment on Dodson's claim for official capacity liability.  Doc. 103. In his motion, he argues that:

- the strip search of Dodson was proper;

- no policy, procedure or custom of the Mayes County Sheriff's Office caused an unconstitutional strip search;

- to the extent the Court believes Dodson's version of events, the use of force was contrary to the policies of the Sheriff's Office;

- because Dodson admits she cannot remember some of what occurred at the jail, she cannot dispute certain material facts set forth by Sheriff Reed;

- no Sheriff's Office policy, procedure or custom caused any constitutional violation; and

- there was no denial of medical care and no policy, procedure or custom that would authorize a denial of medical care.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R.

---

[1] JPX loaders contain shots of oleoresin capsicum—better known as "pepper spray"—which is derived from the cayenne pepper plant. When sprayed in a person's face, it temporarily causes symptoms of burning eyes, nose, mouth and skin, tearing and spontaneous closure of the eyes.

Civ. P. 56(c).  The movant bears the burden of showing that no genuine issue of material fact exists.  *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006).  The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.*  However, the party opposing a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The party opposing a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v.  Catrett*, 477 U.S. 317, 323-33 (1986).

A movant who "will not bear the burden of persuasion at trial need not negate the nonmovant's claim, "but may "simply . . . point[] out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (internal citations omitted).  If the movant makes this prima facie showing, "the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."  *Id.* (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)).  "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.  The mere possibility that a factual dispute may exist, without more, is not sufficient to overcome convincing presentation by the moving party."  *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (internal citations omitted).

### III.  MATERIAL FACTS

Jennifer Eastwood was hired as a Detention Officer at the Mayes County Sheriff's Office ("MCSO") in April of 2013.  She had previous experience serving as a Detention Officer at the Muskogee County Jail.  Doc. 103, Ex. 1, Eastwood Dep., 13:2-7, 14:18-15:9.  Sheriff Reed made sure Eastwood was trained on the Policy and Procedure Manual, beginning when she started in 2013, including training on dealing with medical issues, first aid training and CPR . *Id.*, Ex. 1, Eastwood Dep. at 16:2-20, 17:15-17; 20:1-6; 20:18-21:18, 24:4-24; Ex. 2. Jackson Dep. at 24:4-12, 29:21-30:3; Ex. 3, Reed Dep. at 25:2-5, 31:12-21. The training took place via videos and on-the-job training, a well as classes. *Id.*,  Ex. 1, Eastwood Dep., 26:22-27:5; Ex. 4 Murry Dep, 187:1-188:18; Ex.3, Reed Dep., 25:205, 31:12-21.

Eastwood also received training on when to conduct strip searches, and she understood that at the Mayes County Jail, strip searches were not to be performed automatically, but instead required specific articulable facts, including when an inmate had brought contraband into the jail. *Id.*, Ex. 1, Eastwood Dep., 27:15-28:3; Ex. 3, Reed Dep., 92:15-19, 93:17-94:4).  Eastwood also understood that during a strip search, the inmate was not to be touched, and that the search was to be performed in the detox bathroom with a female officer conducting a strip search of female inmates.  *Id.*, Ex. 1, Eastwood Dep., 28:21-29:15.  Additionally, Eastwood was trained on the Mayes County Jail policies on use of force. *Id.* at 30:25-33:35; 36:13-23; Ex. 3, Reed Dep., 63:23-68:18.

In the past, the Mayes County Jail had used Tasers as a less-than-lethal compliance tool. However, at some point Reed, Undersheriff Gary Shrum ("Shrum") and then Jail Administrator Robert Jackson ("Jackson") decided that it might be beneficial to have to an alternative, less-than-lethal form of force available for use at the Mayes County Jail.  *Id.*, Ex. 3, Reed Dep. at 49:6-16.

After researching the JPX device, they began to work on obtaining it.  *Id.* at 49:6-51:15.  With Reed's authorization,  Jackson attended a law enforcement class on the JPX device on July 20, 2013, and afterwards was certified not only to use the JPX himself, but also to train and certify others.  *Id.*, Ex. 2, Jackson Dep.31:8-13, 35:15-36:18; 37:2-24, 162:23-163:10; Ex. 6, Jackson Instructor Certificate; Ex. 7, JPX Cobra 450 Law Enforcement Training Manual (the "Training Manual").

The Training Manual in effect at that time states that the minimum firing distance for the JPX is five feet, and Jackson trained Eastwood and other officers accordingly.  *Id.*, Ex. 7, Training Manual; Ex. 28, Jackson Dep., 160:1-7; Ex. 9, Oberg Dep., 69:2-25.  The JPX manual does not state that the use of the device is limited to self-defense purposes.  *Id.*, Ex. 7, Training Manual; Ex. 2, Jackson Dep., 160:1-7; Ex. 9, Oberg Dep., 69:9-25.[2] However, Jackson testified that, based on his training, it was his understanding the device was supposed to be used only when an officer felt threatened, and he "didn't see [any] reason why to use it, other than if someone was, you know, threatening you."  Doc. 126, Ex. 28, Jackson Dep., 61:9-25.

The MCSO purchased the JPX Cobras and training materials from JPX of America in July 2013, and the devices were in use at the Mayes County Jail in February 2014.  *Id.*, Ex. 1, Eastwood Dep., 41:1-23, 42:17-19; Ex. 8 July 12, 2013 JPX Cobra Purchase Order; Ex. 2, Jackson Dep., 154:19-155:4; Ex. 3, Reed Dep., 138:24-139:1.

Eastwood and Shift Supervisor Dereck Davis ("Davis") were both trained on the use of the JPX Cobra device by Jackson on August 23, 2013.  *Id.*, Ex. 10, JPX Class Sign-in Sheet, Ex. 11,

---

[2] In 2017—some two years after the incident giving rise to this lawsuit—JPX of America changed its training manual to specify a minimum distance of seven feet rather than five feet, and added language stating that the device should only be used in self-defense. *Id.*, Ex. 9, Oberg Dep. at 78:5-19; Ex. 13, Reed Dep. at 57:5-21, 155:11-23, 171:20-172:5.

Eastwood Certificate of Training.  During the class, they were instructed that the JPX should not be activated closer than five feet from the end of the JPX to the target, and Eastwood practiced deploying the device. *Id.*, Ex. 1, Eastwood Dep., 37:10-24; 38:10-16; 42:6-16; 44:21-45:4; Ex. 7, Training Manual; Ex. 2, Jackson Dep., 30:16-30:22, 38:12-41:17; Ex. 9, Oberg Dep, 77:5-78:21, 86:3-86:17; Ex. 3, Reed Dep., 58:12-20, 61:1-16, 62:9-12.  Eastwood took a Law Enforcement Training Manual test on the use of the JPX, provided by JPX of America, and answered 24 out of 25 questions correctly. *Id.*, Ex. 12, Certification Test of Eastwood on JPX; Ex. 4, Murry Dep, 219:15-220:1; Ex. 2, Jackson Dep., 44:20-48:25, 49:20-50:5, 157:4-158:5, 158:14-17; Ex. 3. Reed Dep., 58:12-20.

Eastwood was trained to aim the JPX at the nose, and that—if used incorrectly—an opponent could be seriously injured. *Id.*, Ex. 7, JPX 450 Cobra Training Manual; Ex. 12, Eastwood JPX Certification Test.  She was also trained that if—after decontamination—a subject's symptoms appear to be worsening, medical attention should be sought. *Id.*, Ex. 7, Training Manual; Ex. 12, Eastwood JPX Certification Test; Ex. 2, Jackson Dep., 51:9-15.  After this class, Jackson believed that Eastwood and other attendees had been appropriately trained.  Ex. 2, Jackson Dep., 59:25-60:5.

Kyle Murry ("Murry") took over as Jail Administrator after Jackson's departure in September of 2013.  *Id.*, Ex. 2, Jackson Dep., 60:2-8; Ex. 4, Murry Dep., 187:1-9, 191:15-192:14. Sheriff Reed, Jail Administrator Jackson, and Jail Administrator Murry were happy with Eastwood's performance and had no concerns about her prior to February 2014.  *Id.*, Ex. 2, Jackson Dep., 64:22-65:15, 68:19-22; Reed Dep., 153:17-154:13, 161:11-4; Murry Dep., 191:15-192:14. They had received no information that she used excessive force, or that she had used the JPX at any point prior to the incident giving rise to this lawsuit; there had been no complaints at all about

her performance; and—as of February 26, 2014—Eastwood had not been reprimanded or disciplined for any reason during her time at the Mayes County Jail. *Id*., Ex. 2, Jackson Dep., 65:22-65:15, 68:19-22; Ex. 3, Reed Dep., 13:17-154:13; 161:11-14; Ex. 4, Murry Dep., 191:15-192:14.

Additionally, as of February 26, 2014, Sheriff Reed had never received any:

- complaints or grievances regarding the use of the JPX at the Mayes County Jail, any incident at the Jail in which the JPX had been used improperly, or that any inmate suffered significant injury from the use of the JPX.

- complaints that any inmate had not received appropriate medical care after the use of a JPX. *Id.,* Reed Declaration, ¶¶4-5.

- complaints about incidents in which strip searches were improperly performed on inmates, or performed without sufficient justification. *Id.*, ¶6.

*Id.*, Ex. 13, Mike Reed Declaration, ¶¶1-6.

Jackson was trained by JPX of America via the Law Enforcement User Training Manual (the "Training Manual") that the appropriate minimum distance on the JPX Cobra device is five feet, and he—likewise—trained other jail staff that five feet was the minimum distance. *Id.*, Ex. 7, JPX Cobra Law Enforcement User Training Manual, pp. 11, 14-15, 17; Ex. 2. Jackson Dep., 52:17-53:16, 56:19-59:4, 156:7-23; Ex. 3, Reed Dep., 58:3-11, 141:14-20; Ex. 8, JPX Cobra Purchase Order.  Training Manual included references to a test that would be given to Mayes County staff. *Id.*, Ex. 7, JPX Cobra Law Enforcement User Training Manual, pp. 11, 14-15, 17; Ex. 2, Jackson Dep., 52:17-53:16, 56:19-59:4, 156:7-156:23; Ex. 3, Reed Dep., 58:3-11, 141:10-20; Ex. 8, July 12, 2013 JPX Cobra Purchase Order.  Jackson had no objection to bringing the JPX to the Mayes County Jail or acting as an instructor on its use. *Id.*, Ex. 2, Jackson Dep., 38:5-8, 42:14-18.

The MCSO purchased the JPX Cobras and training material in July of 2013, and the Cobras were in use at the Mayes County Jail in February of 2014.  *Id.*, Ex. 1; Eastwood Dep., 41-1-23, 42:17-43:19; Ex. 8, JPX Purchase Order; Ex. 2, Jackson Dep., 154:19-155:4; Ex. 3, Reed Dep., 138:23-139:1.  During a class on August 2013, Jackson trained Eastwood, Davis and others on the use of the JPX—including the requirement that it should not be activated closer than five feet from the end of the JPX to the target—and   the participants practiced deploying the device during training.  *Id.*, Ex. 1, Eastwood Dep., 37:10-20, 38:10-16, 42:6-16, 44:21-45:4; Ex. 10, JPX Class Sign-in Sheet; Ex. 11, Eastwood Certificate of Training; Ex. 5, Davis Dep., 35:2-36:5, 38:1-40:25; Ex. 7, Training Manual, Ex. 2, Jackson Dep., 30:16-22, 38:12-41:17; Ex. 9, Oberg Dep., 775-78:21, 86:3-17; Ex. 3, Reed Dep., 58:12-20, 61:1-16, 62:9-12.  Eastwood took a test on the use of the JPX provided by JPX of America, and got 24 out of 25 questions (98%) correct. *Id.*, Ex. 12, Eastwood JPX Certification Test.

Eastwood was trained that she was to aim the JPX Cobra 450 at the nose, and that if used incorrectly, an opponent could be seriously injured.  *Id.*, Ex. 7, Training Manual; Ex. 12, Eastwood JPX Certification Test; Ex 2, Jackson Dep., 40:12-50:24.  She was also trained that if—after decontamination—a subject's symptoms appear to be worsening, medical attention should be sought. *Id.*, Ex. 7, Training Manual; Ex. 12, Eastwood JPX Certification Test; Ex. 2, Jackson Dep., 51:9-15.  Upon completion of the class, Jackson believed Eastwood and others had been appropriately trained.  *Id.*, Ex. 2, Jackson Dep., 59:25-60:5.

After Jackson's departure in September of 2013, Kyle Murry took over as Jail Administrator.  *Id.*, Ex. 2, Jackson Dep., 60:2-8; Ex. 4, Murry Dep., 187:1-9, 191:15-192:14. Sheriff Reed and Jail Administrators Jackson and Murry were happy with Eastwood's performance

and never had any concerns about her before February 2014. *Id.*, Ex. 3, Reed Dep., 153:17-154:13, 161:11-14; Ex. 2, Jackson Dep., 64:22-65:15, 68:19-22; Ex. 4, Murry Dep., 191:15-192:14.

As of February 26, 2014, Reed had received no complaints or grievances regarding the use of the JPX at the Jail, nor had he heard of any incident at the jail in which the JPX had been improperly used, that any inmate suffered significant injury from the use of the JPX, or that any inmate did not receive appropriate medical care after the use of a JPX. *Id.*, Ex. 13, Reed Declaration, ¶¶1-5. Finally, as of February 26, 2014, Reed had never received any complaints regarding incidents in which strip searches were improperly performed or performed without sufficient justification. *Id.*, ¶6.

On Wednesday, February 26, 2014, Dodson drove to a bar in Langley, Oklahoma, where she stayed for two or three hours, played pool and drank a "couple beers" and a "couple shots." *Id.*, Ex. 14, Dodson Dep., 3:17-33:16, 34:18-35:2. At approximately 9:59 p.m., Dodson left the bar, driving her vehicle. Subsequently, the vehicle ran off the roadway and overturned, and paramedics had to extricate Dodson through the back window. *Id.* at 39:25-40:4, 41:25-42:5; Ex. 15, Oklahoma Traffic Collision Report, pp. 1, 4-5; Ex. 16, Overstreet Dep., 67:13-69:12. Dodson admitted the accident occurred because she had been drinking, and she told Oklahoma Highway Patrol ("OHP") Trooper Colby Overstreet ("Overstreet") she had consumed three shots of hard liquor and four beers, had smoked marijuana, and knew she was going to jail. *Id.*, Ex. 14, Dodson Dep., 38:17-39:4, 42:5-43:4; Ex. 15, Oklahoma Traffic Collision Report, pp. 4-5; Ex. 16, Overstreet Dep., 71:7-11, 75:13-76:7. In her deposition, Dodson admitted the accident occurred because she had been drinking and that because of the amount she had been drinking, "there are a few things that were fuzzy" in her memory. Ex. 14, Dodson Dep., 41:2-6.

Trooper Overstreet observed that Dodson had slurred speech, bloodshot eyes and the strong smell of alcohol on her, so he arrested her for driving under the influence and took her to the Mayes County Jail. *Id.*, Ex. 16, Overstreet Dep. at 68:25-69:3; 77:8-16. Because the trooper was a male, he could not do a full search of Dodson in sensitive areas such as inside her bra or around her private parts. He testified that, as a result, Plaintiff needed to be searched more thoroughly once she was at the jail. *Id.* at 79:4-80:14, 128:19-129:12).

At the jail, Shift Supervisor Dereck Davis observed that Dodson's speech was slurred and she was unsteady on her feet. *Id.*, Ex. 5, Davis Dep., 75:23-76:2. The Medical Questionnaire Davis filled out noted that Dodson was under the influence of alcohol. *Id.*, Ex. 17, Medical Questionnaire. Davis testified that Dodson was also noncompliant and belligerent, attempting—against commands—to turn around at the booking counter, and refusing to answer medical questions. *Id.*, Ex. 5, Davis Dep., 69:8-71:7.

Eastwood, who was on duty, performed a pat-down search of Dodson while Dodson was still fully clothed. *Id.*, Ex. 14, Dodson Dep., 53:4-54:1; Ex. 1, Eastwood Dep., 68:21-69:15; Ex. 5, Davis Dep., 72:17-21. Eastwood also searched Dodson's purse, where she discovered a marijuana pipe and a tin containing a Lortab. *Id.*, Ex. 1, Eastwood Dep., 66:21-69:22, 97:1-10, 99:7-9, 112:17-113:5; Overstreet Dep., 72:13-73:10, 74:19-75:12, 9:19-90:19, 98:8-98:19, 105:8-16, 110:2-18. To Eastwood's knowledge, this was the first time the purse had been searched. *Id.*, Ex. 1, Eastwood Dep., 112:4-113:5.

The Mayes County Jail strip search policy then in effect required "reasonable suspicion" to conduct a strip search. Reasonable suspicion could be based on factors such as the nature of the offense charged, the arrestee's appearance and conduct, and/or the arrestee's prior arrest record. *Id.*, Ex. 18, §2.15, Strip Search Policy and Procedures. Eastwood and Davis believed that a strip

search of Dodson was appropriate and necessary because of her possession of paraphernalia and Lortab, and her belligerence and conduct, including her refusal to answer medical questions. *Id.*, Ex. 1, Eastwood Dep., 62:11-64:15, 115:1-116:2; Ex. 19, Eastwood Jail Incident Report; Ex. 4, Murry Dep., 209:1-10.

The strip search policy stated that officers could not touch an inmate's body or search an inmate's body cavities or body orifices, and that no other inmates could be present. *Id.*, Ex. 4, Murry Dep., 208:9-25, 220:9-12; Ex. 18, Mayes County Policy on Strip Searches. The policy also stated that "[t]he Shift Officer must give approval in writing before a strip search may be performed." *Id.*

With Davis's verbal approval, Eastwood took Dodson to a private bathroom to perform a strip search. *Id.*, Ex. 5, Davis Dep., 78:21-79:6; Ex. 14, Dodson Dep., 55:17-56:18, 58:13-15.  For privacy reasons, it was the policy of Mayes County Jail that, in the event a strip search of a female arrestee was necessary, it would be performed by a female in a private bathroom. *Id.*, Ex. 14, Dodson Dep., 55:17-56:18, 58:13-58:15; Ex. 4., Murry Dep., 185:6-186:16; Ex. 5, Davis Dep., 78:21-79:6.

Once inside the bathroom, Eastwood told Dodson that she needed to be strip searched. *Id.*, Ex. 1, Eastwood Dep., 56:16-18; Ex. 12, Mayes County Sheriff's Office Jail Incident Report. Eastwood testified that after Dodson refused, Eastwood told her the strip search was mandatory— by which she meant that Dodson did not have the option to refuse it. *Id.*, Ex. 1, Eastwood Dep., 70:25-71:4; Ex. 4, Murry Dep., 210:5-17; Ex. 18, Strip Search Policy. Davis, who was positioned just outside the bathroom door, testified he heard Dodson tell Eastwood that she could not "make her," which he believed was Dodson's response to Eastwood's command that she submit to a strip search.  *Id.*, Ex. 5, Davis Dep., 81:15-21; 116:12-23. Dodson denies that she refused to be strip

searched, and claims she only told Eastwood she needed to use the restroom—a request Eastwood refused. *Id.*, Ex. 14, Dodson Dep., 60:1-7.

Eastwood ordered Dodson several more times to consent to the strip search.  *Id.*, Ex. 5, Davis Dep., 113:7; Ex. 12, Jail Incident Report.  Each time, Dodson refused.  *Id.*  Finally, Dodson decided to try to de-escalate the situation by handcuffing Dodson and returning her to the holding area, so she ordered Dodson to turn around and face the wall.  *Id.*, Ex. 1, Eastwood Dep., 73:12-74:20.  Eastwood testified that Dodson initially complied with the command.  *Id.*, 77:16-78:14.  However, when Eastwood attempted to handcuff Dodson's left hand, Dodson pulled away from her and turned around so that she was again face-to-face with Eastwood.  *Id.* at 78:13-23.  Dodson testified that she "does not recall" turning back around on Eastwood. Doc. 126, Ex.  2, Dodson Dep., 60:1-62:2.

Trooper Overstreet testified he "specifically remember[ed] numerous warnings were given" to Dodson that Eastwood was going to utilize the pepper gun.  *Id.*, Ex. 16, Overstreet Dep., 46:10-22.  Dodson testified she did "not recall" Eastwood's attempts to handcuff her; that Eastwood ordered her three times to turn back around; or that she did not comply with the orders. *Id.*, Ex. 14, Dodson Dep., 61:5-25.

The Jail's Use of Force/Deadly Force provides, in pertinent part:

**C. INFLAMMATORY AGENTS**

1. INFLAMMATORY AGENTS (products such as Oleoresin Capsicum Pepper Spray and Oleoresin Capsicum/CS Pepper Grenades) MAY BE USED IN THE FOLLOWING SITUATIONS:

- In self-defense and in defending the general public, staff and inmates such as:
- To prevent or quell a disturbance
- To enforce regulations and/or orders in which violation of may threaten security and safety
- To prevent or halt damage to property
- To prevent escape

2.  The amount of force used in the use of inflammatory agents will be no more than is necessary to control the situation.

3. Inflammatory agents will only be used by staff that has successfully completed training in its use.

*Id.*, Ex. 20, §4.08 Use of Force/Deadly Force.

Eastwood asked someone outside in the booking area to give her a JPX Jet Protector ("JPX"), and a loaded JPX was handed to her through a crack in the door.  *Id.*, Ex. 1, Eastwood Dep., 30:25-33:36; 36:13-23, 79:2-15; Ex. 26, Report; Ex. 12, Eastwood JPX Certification Test. Dodson was in the back right corner of the room, so Eastwood stepped under the shower in the front left corner of the room, which she believed was at least five feet away from Dodson.  *Id.*, Ex. 1, Eastwood Dep., 52:22-53:2, 79:2-22; Ex. 26, Report.  She testified she did this to increase the distance between Dodson and her so she could use the JPX.  *Id.*, Ex. 1, Eastwood Dep., 52:22-53:2, 79:2-22; Ex. 12, Report.  Dodson claims Eastwood did not step back five feet, but instead held the JPX device ten inches from her face.  *Id.*, Ex. 14, Dodson Dep., 62:6-63:14, 67:15-68:5.

When Eastwood attempted to fire the JPX at Dodson from under the showerhead, it misfired.  *Id.*, Ex. 1, Eastwood Dep., 53:18-21.  Eastwood asked for someone outside the bathroom to give her another JPX.  She then stepped over to the door, cracked it, stuck her hand out, and was handed a JPX.  *Id.*, 53:18-54:15.

Eastwood testified that she walked back under the showerhead to ensure she was more than five feet away from Dodson, and again commanded Dodson to turn around, but Dodson refused to comply. *Id.*, Ex. 1, Eastwood Dep., 51:13-15, 54:162-3; Ex. 12, Report; Ex. 5, Davis Dep., 51:13-52:24.  Eastwood testified that—while remaining under the shower—she placed the sights of the JPX on Dodson and discharged it.  *Id.*, Ex. 1, Eastwood Dep., 51:1. Subsequently, Davis entered the bathroom.  *Id.*, Ex. 5, Davis Dep., 120:1-8.  He testified that when he opened the bathroom

door, Dodson was in the corner directly in front of him and Eastwood was in the opposite corner to the left of him. *Id.* at 25:23-26:4. She was standing up and appeared to be in pain. *Id.* at 26:15-18.

Eastwood testified that after being shot with the pepper gel, Dodson "complied with the strip search and [I] placed her under the shower." *Id.*, Ex. 1, 55:14-19. Davis testified that although they attempted to wash the pepper spray off her, Dodson backed off and refused to go back into the shower. *Id.,* Ex. 5, 26:19-27:9. He then told Dodson she "needed to get in there so—so she could get the—the spray off because it will alleviate the pain and get rid of it quicker," but Dodson still refused. *Id.*, 27:6-9, 14-21.

Eastwood went to get a towel and jumpsuit. When she returned, she tried to help Dodson, and was able to remove a little bit of gel before Dodson said she didn't want to be touched anymore. *Id.*, Ex. 1, Eastwood Dep., 28:15-8, 16:20. Davis testified that, during this time, Dodson was not screaming like she was in pain, but her face was red and slightly inflamed from the pepper spray. *Id.*, Ex. 5, 28:21-29:2. Eastwood helped Dodson get into a jumpsuit, then took her back out of booking and placed her in a detox cell with a large glass window in front of booking, so that her condition could be monitored. *Id.*, 29:3-14. Eastwood testified Dodson was given an ice pack and a small jug of water, "thinking if she won't let us clean her off . . . [m]aybe she'll clean herself." *Id.* at 29:15-19. Dodson, however, testified that she was given a jug of water, no towel and no paper towels. *Id.*, Dodson Dep., Ex. 14, 71:25-72:11.

Davis testified that that throughout the night "[w]e'd go by and check on her." *Id.*, Ex. 5, 29:20-23. He also testified he had been trained that if an individual had taken a direct shot of pepper spray in the face and had not been decontaminated, there would be redness and swelling

that would eventually stop burning, "but it will take a lot longer." *Id.*, 30:5-13.  He had not, however, been trained on "any specifics of the injuries that it could do." *Id.*, 30:14-22.

At 7:00 a.m. that morning, Davis opened Dodson's cell door and asked her "if she was okay, if she needed anything, and she said, no I don't need anything." *Id.*, 31:3-6, 9-15.  Dodson was later moved to a regular cell in general female population, with other female inmates. *Id.*, Ex. 14, Dodson Dep., 76:17-77:5, 79:7-8; Ex. 10, Oberg Dep., 54:5-21.

Around 8:30 a.m., Jail Nurse Amy Welker ("Welker") saw Dodson.  *Id.*, Ex. 19, Welker Incident Report, Doc. 107-8; Ex. 14, Dodson Dep., 76:17-77:15, 79-8; Ex. 24, Welker Dep., 44:17-45:8, 50:20-23, 60:13-20, 61:16-20, 63:9-64:25.  Welker observed that Dodson's left eye was swollen and contained pepper gel, and there was dried pepper gel on Dodson's left cheek.  *Id.*, Ex. 19, Welker Incident Report; Ex. 20, Welker Dep., 44:17-45:8, 50:20-23, 60:13-20, 61:16-20, 63:9-64:25.  Welker told Dodson to further rinse out her eye in the shower, and she gave her a "warm cold pack."  Ex. 14, Dodson Dep., 76:17-77:15, 79:7-8; Ex. 4, Murry Dep., 197:21-198:8.  Welker testified that at approximately 1:30 p.m., she saw Dodson again and noted that the orange pepper gel was still in her eye.  Ex. 20, Welker Dep., 56:4-8, 60:13-61:20, 86:12-18.[3]

However, Dodson challenges the accuracy and reliability of Welker's testimony and her incident report.  First, Welker testified that she has no memory of seeing Dodson, and relies solely on her incident report.  Doc. 126, Ex. 17, Welker Dep. at 46:14-18.  Additionally, there are three different incident reports, purportedly written by Nurse Welker, concerning her interaction with Dodson on February 27, 2014.  See Doc. 126, Ex. 18, Welker Incident Reports.  Each concerns

---

3 Welker's Report states that when she asked Dodson why she had not washed out her eye, Dodson responded that "she wanted the Judge to see." *Id.*, Ex. 19, Welker Incident Report. See also, Ex.24, Welker Dep., 56:4-8; 60:13-61:20, 86:12-18. Dodson denies a second interaction ever occurred. Ex. 1, Dodson Dep., 80:2-17.

the same event, with various additions, deletions or rewording certain details.  Second, Mitch Goodman, the Sheriff's Fed. R.Civ. P. 30(b)(6) witness, testified that—based on all of the evidence—it appears as though none of the three versions of the incident report were completed until on or after October 23, 2014—eight months after the incident. *Id.*, Ex. 19, Goodman Dep. at 60:8-61:25; 62:8-12; 63:21-64:3. Finally, Welker—despite not signing the report until—at the earliest, October 24, 2014, falsified the handwritten date next to her signature, dating it "2-27-14." *Id.*, Ex. 18.

Welker testified she never believed Dodson was undergoing a serious medical condition, and if she believed so, she would have made sure Dodson received transportation to a medical facility.  *Id.*, 88:24-89:7. Neither Jail Administrator Murry nor Sheriff Reed believed Welker or Eastwood lied or fabricated any portion of their reports. *Id.*, Ex. 4, Murry Dep., 198:21-199:10; Ex. 13, Reed Dep., 156:13-157:4.

Dodson was released from Mayes County Jail custody on February 27, 2014 at 2:23 p.m. *Id.*, Ex. 1, Dodson Dep., 87:7-24; Ex. 27, Release Sheet; Ex. 28, Order of Release.  The next day, Murry investigated the events surrounding Eastwood's use of the JPX.  Based on Eastwood's description of the incident, Murry measured the distance between Eastwood and Dodson when Eastwood discharged the JPX, and determined the two were approximately six feet, three inches apart when Eastwood fired the JPX.  He also determined the use of the JPX was permitted under the circumstances.  Ex. 4, Murry Dep., 205:9-207:15, 213:1-214:12; Ex. 29, Interoffice Memo; Ex. 9, Oberg Dep., 41:2-44:2, 110:4-16.

**IV. Analysis**

A claim against a state actor in his official capacity—such as Sheriff Reed—"is essentially another way of pleading an action against the county or municipality" he represents, and is

considered under the standard applicable to §1983 claims against municipalities or counties.  *Porro v. Barnes*, 623 F.3d 1322, 1328 (10th Cir. 2010). In *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978), the Supreme Court held that municipalities and other local governmental bodies are "persons" within the meaning of §1983, and that "a local government may not be sued under §1983 for an injury inflicted solely by its employees or agents."  Accordingly, in order to establish *Monell* liability, a plaintiff "must prove an '(1) official policy or custom[,] (2) causation, and (3) state of mind.'"  *Hinkle v. Beckham Cty. Bd. of Cty. Commissioners*, 962 F.3d 1204, 1239 (10th Cir. 2020) (internal citations omitted).  In other words, "[a] plaintiff seeking to impose liability on a municipality under §1983 must identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of County Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997).

Moreover, a municipality may only be held liable for its own illegal acts and cannot be held vicariously liable for its employees' actions.  *Id.*  Accordingly, in order for Sheriff Reed to be held liable in his official capacity, Dodson must establish that "(1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the deprivation."  *Walker v. City of Orem*, 451 F.3d 1139, 1152 (10th Cir. 2006). Accordingly, the absence of a constitutional violation by the officers of a municipality precludes a finding of liability against the municipality itself.  *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993).

### A. Reasonable Suspicion

The Sheriff argues he is entitled to summary judgment on Dodson's strip search claim because Eastwood had reasonable suspicion to perform a strip search.

The Tenth Circuit held that strip searches of pretrial detainees are permissible when officers possess reasonable suspicion that the detainee has concealed weapons, drugs or contraband. *Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008). "Reasonable suspicion for a search is a minimum level of objective justification based on the totality of the circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense." *Id.* (quotations omitted). However, an officer must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Stearns v. Clarkson*, 615 F.3d 1278, 1287 (10th Cir. 2010).

Here, the undisputed facts establish that:

- Dodson was going to be admitted to the general population;

- Drug paraphernalia and a Lortab were found in Dodson's purse;

- Dodson was belligerent and uncooperative during the booking process.

These facts formed the basis for a "reasonable suspicion" that Dodson might have concealed drugs on her person, and supported a conclusion that the strip search was necessary to ensure that contraband was not brought into the facilities. Accordingly, the Sheriff is entitled to summary judgment against Dodson on her claim that the strip search was unlawful.

### B. Constitutionality of Blanket Strip Search Policy

The Sheriff denies the jail has a policy of mandatory strip searches. However, he argues that even if the strip search occurred as part of a mandatory policy, it was not unconstitutional. "The Fourth Amendment prohibits only unreasonable searches" *Bell v. Wolfish*, 441 U.S. 520, 558 (1979), and "while an inmate's right to privacy 'does not vanish altogether,' it 'must yield to the penal institution's need to maintain security.'" *Farmer v. Perrill*, 288 F.3d 1254, 1259 (10th Cir. 2002) (internal quotation marks omitted).

In *Florence v. Board of Chosen Freeholders of Burlington*, 566 U.S. 318 (2012), the Supreme Court addressed the constitutionality of blanket strip search policies. There, the plaintiff had been stopped by a New Jersey state trooper. *Id.* at 323. During the stop, the trooper learned of an outstanding 2003 bench warrant that—unknown to the trooper—had mistakenly remained active in a law enforcement database despite plaintiff's having paid the underlying fine. *Id.* The plaintiff was taken to the Burlington County Detention Center, and held for six days, and then to the Essex County Correctional Facility, where he was held for two days, until charges against him were dismissed. *Id.* at 323-324. Pursuant to blanket strip search policies, both facilities required him to submit to a strip search. *Id.* Subsequently, the plaintiff sued both facilities alleging violation of his rights under 42 U.S.C. §1983. The district court granted the plaintiff's motion for summary judgment on the unlawful search claim, concluding that any policy of "strip searching" nonindictable offenders without reasonable suspicion violated the Fourth Amendment. *Id.* at 325. A divided panel of the Third Circuit Court of Appeals reversed, concluding that the procedures struck a reasonable balance between inmate privacy and the security needs of the jails. *Id.* The plaintiff appealed the decision to the Supreme Court. *Id.*

The Supreme Court reversed the Court of Appeals, stating that, "in addressing this type of constitutional claim courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security," *Id.* at 322-323. Citing *Atwater v. City of Lago Vista*, 532 U.S. 318, 347 (2001), it stated:

> Officers who interact with those suspected of violating the law have an "essential interest in readily administrable rules." The officials in charge of the jails in this case urge the Court to reject any complicated constitutional scheme requiring them to conduct less thorough inspections of some detainees based on their behavior, suspected offense, criminal history, and other factors. They offer significant reasons why the Constitution must not prevent them from conducting the same

19

> search on any suspected offender who will be admitted to the general population in
> their facilities.  The restrictions suggested by petitioner would limit the intrusion
> on the privacy of some detainees but at the risk of increased danger to everyone in
> the facility, including the less serious offenders themselves.

*Id.* at 338.  The Court concluded that the search procedures at the two facilities "struck a reasonable

balance between the needs of the institutions."  *Id.* at 339.

In *Hyberg v. Enslow*, 801 Fed. Appx. 647 (10th Cir. 2020), a state prisoner who was housed

at the Sterling Correctional Facility and worked at the Colorado Correctional Industries Seating

Factory, filed a pro se lawsuit challenging the facility's practice of subjecting him to strip searches

when he left the Seating Factory at the end of his shift.  The appellate court acknowledged that

"[t]he scope of the searches here was undeniably invasive" and "[t]here can be no doubt that a strip

search is an invasion of personal rights of the first magnitude."  *Id.* at 650.   Nonetheless, it

concluded that "there are obvious security concerns inherent when an inmate will be placed in the

general prison population, and because the inmate was returning to general population when he

was subjected to the end of his shifts at the Seating Factory, "[t]here were therefore legitimate

security interests served by the searches."  *Id.* It further noted that the searches were conducted "in

a uniform manner, following routine protocol, in a designated area with limited access for other

inmates and staff."  *Id.*[4]

---

[4] Recently, in *Hinkle v. Beckham County Board of County Commissioners*, the Tenth Circuit Court
of Appeals addressed a challenge to a Beckham County, Oklahoma, policy that mandated a body-
cavity strip search of all detainees before any decision was made about where particular detainees
would be housed in the jail's general population.  962 F.3d 1204 (10th Cir. 2020).  Under the
policy, all detainees were strip searched before they were even booked.  *Id.* at 1235.  The appellate
court observed that in *Florence*, the Supreme Court "repeatedly stressed that the strip search comes
*after* the facility determines the detainee 'will be' placed in general population" and had
commented that "'[t]his case does not require the Court to rule on the types of searches that would
be reasonable in instances where, for example, a detainee will be held without assignment to the
general jail population and without substantial contact with other detainees."  *Id.* at 1237 (emphasis
added).  The court concluded that "because the jail officials never decided that Hinkle 'w[ould]

Pursuant to *Florence*, the Court concludes that even if—as Dodson alleges—the Jail had a blanket practice of strip searching all arrestees as part of the process of booking them into the general population of a detention facility, the practice is constitutionally permissible. Accordingly, the Sheriff is entitled to summary judgment on Dodson's claim that the strip search violated §1983 and the Fourteenth Amendment.

### C. Whether Alleged Use of Force Was Tied to a Sheriff's Office Policy

In *Monell*, the Supreme Court held that a government entity is only liable under §1983 when the constitutional injury can fairly be said to have been caused by the entity's own policies and customs.  436 U.S. at 694-95.  In other words, governmental liability for a constitutional violation "attaches where—and only where—the entity makes a deliberate choice to follow a course of action from among various alternatives." *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986).  The entity may not be held liable in its official capacity simply because it "employs a tortfeasor." *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 403 (1997).

The Sheriff argues that—even if Dodson's allegations regarding Eastwood's use of the JPX are construed in the light most favorable to Dodson—the evidence nevertheless establishes that Eastwood was properly trained on the use of the JPX and, if—as Dodson asserts—Eastwood was less than five feet from her when she deployed the JPX—then Eastwood's use of the JPX was contrary to MCSO policies and procedures.

However, the Sheriff's position ignores at least one issue.  It is undisputed that the Sheriff decided to bring the JPX into the Jail as "a *compliance tool* other than a Taser." Doc. 126, Ex. 29, Reed Dep. at 49:11-50:11 (emphasis added).  Thus, there is merit to Dodson's argument that

---

be' housed at the county jail, no one had any reason to fear that Hinkle might have secreted contraband that he could take into the jail's general population." *Id.* at 1239.

"[t]raining employees to use the powerful and dangerous JPX as a tool to quell passive resistance was not only contrary to the manufacturer's safety warnings, but also well-established constitutional norms." *See* Doc. 126 at 34.

A material issue of fact remains concerning whether the Sheriff's decision to use the JPX as a compliance tool violated Dodson's constitutional rights. Accordingly, the Sheriff's Motion for Summary Judgment on Dodson's claim for violation of her rights under §1983 is denied.

### D. Denial of Medical Care

Dodson alleges she was denied proper medical care in the aftermath of the deployment of the JPX. "A prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eight Amendment's prohibition against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "The test for constitutional liability of prison officials involves both an objective and a subjective component." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). A prisoner must first produce "objective evidence that the deprivation at issue was in fact sufficiently serious." *Id.* at 751. The Tenth Circuit has stated that "a medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (internal citation and quotation omitted). The Sheriff does not dispute that Dodson's injuries satisfy the objective element of the test. Doc. 103 at 38.

The subjective prong of the test "requires the plaintiff to present evidence of the prison official's culpable state of mind," and it is satisfied if the official "knows of and disregards an excessive risk to inmate health or safety . . . [T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Id.* "A prison medical professional who serves solely . . . as a gatekeeper for

other medical personnel capable of treating the condition may be held liable under the deliberate indifference standard "if she delays or refuses to fulfill the gatekeeper role." *Id.* (internal citations omitted).

To meet the subjective prong, Dodson must show that an individual agent of the Sheriff in his or her official capacity acted with a "sufficiently culpable state of mind," in a manner so egregious that it constitutes "deliberate indifference" to a substantial risk of serious harm to an inmate. *Farmer v. Brennan*, 511 U.S. 825, 834.  Plaintiff must demonstrate a specific jail employee was aware of a known or obvious risk of serious harm, and did not act to mitigate that risk. *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999). Collective liability is insufficient— one or more specific jail employee must have acted with deliberate indifference.   *Burke v. Regalado*, 2019 WL 3938633 at *30-31 (10th Cir. August 20, 2019).

Eastwood and Davis attempted to help her wash the gel off her face, provided her—at a minimum—with a jug of water, and monitored her through the night; Davis checked on her before his shift ended, asking her if she needed anything.  However, based on the discrepancies between Dodson's and Nurse Welker's testimony, the existence of three versions of Welker's report, and Goodman's testimony that the report was not completed until eight months after the incident, the Court concludes a material issue of fact exists about whether Nurse Welker acted with "deliberate indifference" to the risk of harm to her.

Accordingly, Reed's motion for summary judgment on Dodson's claim for denial of medical care is denied.

**V. Conclusion**

Reed's Motion for Summary Judgment is granted with respect to Dodson's claim that the mandatory strip search was, *per se*, unconstitutional, and denied with respect to her claim that she was denied proper medical care.

ENTERED this 2nd day of September, 2021.

**TERENCE KERN**
**United States District Judge**