### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| NATASHA DODSON, ) | |
| ) | |
| Dodson, ) | |
| ) | |
| v. ) | Case No. 18-CV-221-TCK-CDL |
| ) | |
| MIKE REED, in his official capacity; ) | |
| JENNIFER EASTWOOD, ) | |
| ) | |
| Defendants. | |

### **OPINION AND ORDER**

Before the Court is the Motion for Summary Judgment filed by defendant Jennifer Eastwood ("Eastwood"). Doc. 106. In her motion, Eastwood seeks summary judgment on claims asserted by plaintiff Natasha Dodson ("Dodson") for unlawful search, excessive force, and denial of medical care. Doc 106. Dodson opposes the motion. Docs. 122, 127.[1]

**I. Background**

Following a single-vehicle rollover accident on February 26, 2014, Dodson was arrested for driving under the influence, and subsequently transported and booked into the Mayes County Jail. During the booking process, Eastwood—a jail officer—conducted a search of Dodson's purse, in which she found a metal pipe and a container with multiple pills, one of which was identified as Lortab. Thereafter, Eastwood took Dodson into a bathroom near the jail's booking area, and told her that a strip search was mandatory under the circumstances, and that she could not refuse the search. After attempting unsuccessfully to handcuff Dodson, Eastwood deployed a

---

[1] Doc. 122 is Dodson's original response to Eastwood's Motion for Summary Judgment. Doc. 127, "Errata Correction," contains corrected Exhibits 14 ("JPX Training Manual") and 24 (JPX Instruction and Safety Manual)—which were originally reversed, as well as pages that had been omitted from four of her exhibits.

Jet Protector loader ("JPX")[2] toward Dodson's face, conducted the search, placed her in the shower with instructions to wash out the remaining residue in her eyes and gave her a jug of water, and paper towels to wipe off any residue. Dodson was released the following day.

In her Amended Complaint, Dodson asserts a claim against Eastwood for violation of her Fourteenth Amendment rights (Count A), and against Sheriff Reed for official capacity liability (Count B). She seeks actual and compensatory damages and punitive damages in excess of $75,000 for physical torture, abuse, pain, suffering, mental pain and anguish and medical expenses, plus prejudgment and post judgment interest and costs.

## II. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.* However, the party opposing a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party opposing a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

---

[2] The JPX contains shots of oleoresin capsicum—better known as "pepper spray"—which is derived from the cayenne pepper plant. When sprayed in a person's face, it temporarily causes symptoms of burning eyes, nose, mouth and skin, tearing and spontaneous closure of the eyes.

A movant that "will not bear the burden of persuasion at trial need not negate the nonmovant's claim, "but may "simply . . . point[] out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (internal citations omitted). If the movant makes this prima facie showing, "the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)). "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial. The mere possibility that a factual dispute may exist, without more, is not sufficient to overcome convincing presentation by the moving party." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (internal citations omitted).

### III. Material Facts

On the evening of Wednesday, February 26, 2014, Natasha Dodson was drinking at a bar in Langley, Oklahoma. Doc. 106, Ex. 1, Dodson Dep. at 30:17-23. She had been at the bar for "two, maybe three hours," during which she drank beer and had a "few shots of whiskey." *Id.* at 32:13-18; 31:2-17. Subsequently, Dodson left the bar, got in her pick-up truck, and drove south on State Highway 82. *Id.* at 36:6-38:19. At approximately 9:59 p.m., Dodson lost control of her truck and overturned on the driver's side door on the west side of the highway, a half-mile south of the intersection with County Road 410. *Id.* at 37:6-38:19; Ex. 2, Overstreet Dep., 19:17-21; Ex. 3, Report; Ex. 4 Official Oklahoma Traffic Collision Report at 4.

Trooper Colby Overstreet ("Overstreet") arrived at the scene of the accident and found Dodson in the back of an ambulance. *Id.*, Ex. 2, Overstreet Dep. at 20:5-10. He noted that Dodson smelled of alcohol, her eyes were bloodshot, and her speech was slurred. *Id.* at 20:5-16, 24:13-16; Ex. 3, Oklahoma Highway Patrol ("OHP") Report of Investigation, at p. 3. Dodson admitted to Overstreet that she had been drinking and submitted to a test on his hand-held device, but refused an official sobriety test. Doc. 106, Ex. 1, Dodson Dep. at 12-17; 38:20-39; 40:20-42:23; Ex. 2, Overstreet Dep. at 77:19-22, 111:1722; Ex. 3, Report of Investigation. Overstreet arrested Dodson and transported her to the Mayes County Jail. *Id.*, Ex. 1, Dodson Dep. at 46:22-47:7; Ex. 2, Overstreet Dep. at 77:19-22, 111:17-22; Ex. 3, OHP Report.

When Overstreet and Dodson arrived at the booking desk inside the Jail, Shift Supervisor Dereck Davis began the book-in process, part of which involved removing Dodson's jewelry and asking her questions. *Id.*, Ex. 1, Dodson Dep. at 5:23-51:2, 52:5-9, 54:1-9; Ex. 2, Overstreet Dep. at 114:2-15; Ex. 5, Eastwood Dep. at 65:16-20; Ex. 6, Davis Dep. at 70:2-4, 71:1-9.

Eastwood arrived at some point in the initial book-in process, and conducted a pat-down search of Dodson, checking her pockets while Dodson was fully clothed. Ex. 1, Dodson Dep. at 53:4-12. Dodson's purse was also searched, and officers found marijuana, a clear thick plastic dugout with a metal pipe, and a tin container containing one Lortab and two other kinds of non-controlled substances. *Id.*, Ex. 2, Overstreet Dep. at 114:2-6, 9-15.[3]

Davis testified during the booking process, Dodson was "very uncompliant" and "[b]orderline belligerent," refusing to listen to commands or answer his questions. *Id.*, Ex. 6, Davis

---

[3] Dodson ultimately pled guilty to charges of receiving for driving a motor vehicle while under the influence, possession of a controlled dangerous substance and unlawful possession of drug paraphernalia. Doc. 106, Ex. 1, Dodson Dep. at 49:3-15.

Dep. at 69:8-70:24, 74:6-76:2. He also testified that Dodson was "unsteady on her feet," slurred her words and appeared to be "under the influence of . . . something." *Id.* at 75:23-76-2.

The Mayes County Jail strip search policy then in effect stated that no strip search will be performed on any arrestee or inmate unless a Jail Facility Officer has reasonable suspicion that the person possesses a weapon or contraband. Doc. 107, Ex. 14, Mayes County Policy and Procedure on Strip Searches, 2.15; *Id.*, Ex. 3, Reed Dep. at 20:1-10; *Id.*, Ex. 4, Murry Dep. at 208:9-25, 220:9-12. Reasonable suspicion could be based on such factors as the nature of the offense charged, the arrestee's appearance and conduct, and the prior arrest record. Doc. 103, Ex. 4, Murry Dep. at 208:10-209:3, 209:5-8, 10. Jail staff were provided the strip search policy. *Id.*, Ex. 5, Davis Dep. at 83:16-84:5, 87:24-88:14, 92:8-93:3.

Because Dodson was refusing to answer questions, Davis told Eastwood to "dress her out and we would try the booking process again later and that it needed to be a sensitive search," *i.e.,* a strip search. Doc. 106, Ex. 6, Davis Dep. at 75:14-22, 78:25-79:6. The officers believed that a strip search of Dodson was appropriate based on the nature of Dodson's charges, the fact that she possessed a narcotic pill and drug paraphernalia, and her overall demeanor, including her refusal to answer questions. *Id.*, Ex. 5, Eastwood Dep., 27:22-28:15, 62:11-53:25, 101:7-23, 106, 115:1-116:1; Ex. 6 Davis Dep., 79:9-25; Ex. 9, Murry Dep., 51:10-22, 72:4-18; Ex. 12, Eastwood Incident Report, 0002.

Sheriff Reed testified that strip searches are performed "for the safety of the inmates and also the safety of the jailers," to prevent people from bringing either contraband and/or a weapon into the jail. *Id.*, Ex. 13, Reed Dep. at 162:2-14. Eastwood testified she was trained that she could perform a strip search when she had probable cause—as indicated by the presence of contraband on their person or property—and she believed the discovery of contraband in Dodson's purse and

the nature of Dodson's charges gave her probable cause. *Id.,* Ex. 5, Eastwood Dep,, 27:22-28:15, 29:2-30:2-14, 62:11-63:25, 101:7-23, 106:4-9, 115:1-116:1. Eastwood also knew that in performing the search, she could not touch Dodson's body. *Id.*, Ex. 5, Eastwood Dep.,29:3-19, 71:7.

Per jail practice, Dodson was originally placed in a detoxification cell, which is akin to a holding cell. *Id.*, Ex. 6, Davis Dep., 124:7-14; Ex. 10, Oberg Dep., 52:15-54; Ex. 11, Mayes County Sheriff's Office ("MCSO") Cell Movement Log, 987. From these cells, inmates are transferred to other general population pods in the jail, as Dodson eventually was. *Id.*, Ex. 6, Davis Dep., 124:7-14; Ex. 11, MCSO Cell Movement Log, 987.

Eastwood moved Dodson from the detoxification cell to a bathroom off of the booking area. *Id.*, Ex. 5, Eastwood Dep. at 28:24-29:2; Ex. 1, Dodson Dep. at 56:6-18. No one else was present in the bathroom, but Davis was positioned outside. *Id.*, Ex. 6, Davis Dep. at 15-21. The booking area bathroom has a toilet in the back-left corner and a shower in the front left corner. *Id.*, Doc. 107, Ex. 5 at 2-3, bathroom photos. The back right corner is off-set from the bathroom by 12 additional inches. *Id.*, Ex. 5 at 2, 4. The distance from the left-front corner to the back-right corner is approximately 10.13 feet. *Id.*, Ex. 16, MCSO Booking Area Bathroom Blueprint.

Once inside the bathroom, Eastwood told Dodson that she needed to be strip-searched. *Id.*, Ex. 1, Dodson Dep. at 56:16-18. When Dodson refused, Eastwood told her the strip search was mandatory. *Id.*, Ex. 5, Eastwood Dep. at 70:25-71:4. Davis, who was positioned just outside the bathroom door, heard Dodson tell Eastwood that she could not "make her," which he believed was Dodson's response to Eastwood's command that she submit to a strip search. *Id.*, Ex. 6, Davis Dep. at 81:15-21; 116:12-23. Dodson denies that she refused to be strip-searched, and claims she

6

only told Eastwood she needed to use the restroom—a request Eastwood refused. *Id.*, Ex. 1, Dodson Dep. at 59:10-60:13.

In an attempt to de-escalate the situation, Eastwood decided she would handcuff Dodson and return her to the holding area, so she ordered Dodson to turn around and face the wall. *Id.*, Ex. 5, Eastwood Dep. at 73:12-74:20. Eastwood testified that Dodson initially complied with the command, but when Eastwood attempted to handcuff her left hand, Dodson pulled away from her and turned around so that she was face-to-face with Eastwood. *Id.* at 77:16-78:23.

Trooper Overstreet testified he "specifically remember[ed] numerous warnings were given" by Eastwood to Dodson that she was going to utilize the pepper gun if Dodson didn't turn around. *Id.*, Ex. 2, Overstreet Dep. at 46:10-22. Dodson testified she did "not recall" Eastwood's attempts to handcuff her, that Eastwood asked for a JPX Jet Protector or ordered her three times to turn around, or that she did not comply with the orders. *Id.*, Ex. 1, Dodson Dep. at 61:6-25.

The Jail's Use of Force/Deadly Force provides, in pertinent part:

**C. INFLAMMATORY AGENTS**

> 1. INFLAMMATORY AGENTS (products such as Oleoresin Capsicum Pepper Spray and Oleoresin Capsicum/CS Pepper Grenades) MAY BE USED IN THE FOLLOWING SITUATIONS:
>
> - In self-defense and in defending the general public, staff and inmates such as:
> - To prevent or quell a disturbance
> - To enforce regulations and/or orders in which violation of may threaten security and safety
> - To prevent or halt damage to property
> - To prevent escape
>
> 2. The amount of force used in the use of inflammatory agents will be no more than is necessary to control the situation.
>
> 3. Inflammatory agents will only be used by staff that has successfully completed training in its use.

7

> 4. Inflammatory agents will not be carried by individual staff into inmate contact living areas. Placement of inflammatory agents in contact inmate living areas shall require the approval of the Jail Administrator/designee. Inflammatory agent spray will be weighed and logged upon reception, quarterly, and after each use. Upon expiration the Jail Administrator/designee will ensure proper disposal. When no[t] in use inflammatory agents will be stored in Central Control.

*Id.*, Ex. 17, §4.08.5.C.

Eastwood, who had been trained on those policies, asked someone outside in the booking area to give her a JPX and a loaded JPX was handed to her through a crack in the door. *Id.*, Ex. 5, Eastwood Dep. at 30:25-33:14; 36:13-23, 79:2-15; Ex. 12, Report; Ex. 28, JPX Certification Test. She testified that Dodson was in the back right corner of the room, so she stepped under the shower in the front left corner of the room, which she believed was at least five feet away from Dodson. *Id.*, Ex.5, Eastwood Dep. at 52:22-53:2, 79:2-22; Ex. 12, Report. She did this to increase the distance between Dodson and her so she could use the JPX. *Id.*, Ex. 5, Eastwood Dep. at 52:22-53:2, 79:2-22; Ex. 12, Report. Dodson claims Eastwood did not step back five feet, but instead held the JPX ten inches from her face. *Id.*, Ex. 1, Dodson Dep. at 62:6-63:14, 67:15-68:5.

When Eastwood attempted to deploy the JPX, it misfired. *Id.*, Ex. 5, Eastwood Dep. at 53:18-21. Eastwood asked for someone outside the bathroom to give her another JPX. She then stepped over to the door, cracked it open, and was handed a loaded JPX. *Id.* at 53:18-54:15.

Eastwood testified that she again stepped back under the showerhead to ensure she was more than five feet away from Dodson, commanded Dodson to turn around, and—after Dodson refused the command—placed the sights of the JPX on Dodson and discharged it. *Id.* at 51:1. *Id.*, Ex. 5 at 51:13-15, 54:16-18; Ex. 12, Report. Dodson, however, denies Eastwood stepped back. *Id.*, Ex. 1, Dodson Dep at 66:17-25.

8

Immediately after Eastwood fired the JPX, Davis entered the bathroom. *Id.*, Ex. 6, Davis Dep. at 120:1-8.  He testified that when he opened the bathroom door, Dodson was in the corner directly in front of him and Eastwood was in the opposite corner to the left of him. *Id.* at 25:23-26:4. Dodson was standing up and appeared to be in pain. *Id.* at 26:15-18.

Eastwood testified that after being shot with the pepper gel, Dodson "complied with the strip search and [I] placed her under the shower." *Id.*, Ex. 5 at 55:14-19.

Eastwood went to get a towel and jumpsuit.  When she returned, she tried to help Dodson, and was able to remove a little bit of gel before Dodson said she didn't want to be touched anymore. *Id.* at 28:15-8, 16:20.  Davis testified that, during this time, Dodson was not screaming like she was in pain, but her face was red and slightly inflamed from the pepper spray. *Id.*, Ex. 6 at 28:21-29:2.  Eastwood helped Dodson get into a jumpsuit, then placed her in a detox cell with a large glass window in front of booking, so that her condition could be monitored.  *Id.*, Ex. 5 at 29:3-14. Eastwood testified that she gave Dodson an ice pack and a small jug of water, "thinking if she won't let us clean her off . . . [m]aybe she'll clean herself." *Id.* at 29:15-19.[4]

Davis testified that throughout the night "[w]e'd go by and check on her." *Id.,* Ex. 6, Davis Dep.  at 29:20-23. He also testified he had been trained that if an individual had taken a direct shot of pepper spray in the face and had not been decontaminated, there would be redness and swelling that would eventually stop burning, "but it will take a lot longer." *Id.* at 30:5-13.

Davis testified that at 7:00 a.m. that morning, he opened Dodson's cell door and asked her "if she was okay, if she needed anything, and she said, [n]o I don't need anything." *Id.* at 31:3-6,

---

4 Dodson disputes this, and testified that Eastwood brought her only a jug of water.  Doc. 122, Ex. 2, Dodson Dep. at 71:25-72:8.

9-15. Dodson was later moved to a regular cell in general female population, with other female inmates. *Id.*, Ex. 1, Dodson Dep., 76:17-77:5, 79:7-8; Ex. 10, Oberg Dep., 54:5-21.

Around 8:30 a.m., Jail Nurse Amy Welker[5] (the "Jail Nurse") saw Dodson. *Id.*, Ex. 19, Welker Incident Report, Doc. 107-8; Ex. 1, Dodson Dep. at 76:17-77:15, 79-8; Ex. 20, Amy Moore Dep. at 44:17-45:8, 50:20-23, 60:13-20, 61:16-20, 63:9-64:25. She observed that Dodson's left eye was swollen and contained pepper gel, and also saw dried pepper gel on Dodson's left cheek. *Id.*, Ex. 19, Welker Incident Report; Ex. 20, Moore Dep. at 44:17-45:8, 50:20-23, 60:13-20, 61:16-20, 63:9-64:25. The Jail Nurse told Dodson to further rinse out her eye in the shower, and she gave her a "warm cold pack." Ex. 1, Dodson Dep. at 76:17-77:15, 79:7-8; Ex. 9, Murry Dep. at 197:21-198:8. Dodson testified she rinsed her eye out in the sink but didn't use the shower because she hadn't been given any towels. *Id.*, Ex. 1 at 78:24-79:19. At approximately 1:30 p.m., the Jail Nurse saw Dodson again and noted that the orange pepper gel was still in her eye. *Id.*, Ex. 20, Welker Dep. at 56:4-8, 60:13-61:20, 86:12-18.[6]

Like Davis and Eastwood, the Jail Nurse never believed Dodson was undergoing a serious medical condition. She testified that if she had believed so, she would have made sure Dodson received transportation to a medical facility. *Id.* at 88:24-89:7. Additionally, neither Jail Administrator Murry nor Sheriff Reed believed Welker or Eastwood lied or fabricated any portion of their reports. *Id.*, Ex. 9, Murry Dep., 198:21-199:10; Ex. 13, Reed Dep. at 156:13-157:4.

---

[5] At the time of the incident giving rise to this lawsuit, the witness's last name was Welker. At the time of the witness's deposition, her last name was Moore.

[6] Welker's Report states that when she asked Dodson why she had not washed out her eye, Dodson responded that "she wanted the Judge to see." *Id.*, Ex. 19, Welker Incident Report. See also, Ex.20, Welker Dep. at 56:4-8;, 60:13-61:20, 86:12-18. Dodson denies a second interaction ever occurred. *Id.*, Ex. 1, Dodson Dep. at 80:2-17.

10

Dodson was released from jail custody on February 27, 2014 at 2:23 p.m. *Id.*, Ex. 1, Dodson Dep. at 87:7-24; Ex. 21, Release Sheet; Ex. 22, Order of Release. The next day, Murry investigated the events surrounding Eastwood's use of the JPX. Based on Eastwood's description of the incident, Murry measured the distance between Eastwood and Dodson when Eastwood discharged the JPC, and determined the two were approximately six feet, three inches apart when Eastwood fired the JPX. He also determined the use of the JPX was permitted under the circumstances. Ex. 4, Murry Dep. at 205:9-207:15, 213:1-214:12; Ex. 29, Interoffice Memo; Ex. 9, Oberg Dep. at 41:2-44:2, 110:4-16.

### IV. Analysis

Dodson asserts three Fourteenth Amendment claims against Eastwood. First, she contends Eastwood lacked cause to perform a strip search on her. Second, she claims Eastwood used excessive force in firing the JPX at her when she would not comply with Eastwood's orders. Third, she claims Eastwood acted deliberately indifferent to her medical condition and thereby denied her adequate medical care.

#### A. Dodson's Unlawful Search Claim

Dodson alleges in her Complaint that the strip search was unlawful because there was no probable cause or reasonable suspicion to perform a strip search; MCSO has an unconstitutional "blanket strip search" policy; Eastwood lacked probable cause or reasonable suspicion to search her; and her right to be free from a strip search under the circumstances was "clearly established." Doc. 69, ¶¶15-19, 42. Eastwood, in her summary judgment motion, contends that she had probable cause to perform the strip search and, moreover, that even if she lacked probable cause or reasonable suspicion, the Constitution permits officers to perform a strip search with no prior standard of belief about the individual as long as that individual is not touched in the process, is

11

set to be admitted to a general population housing unit or something equivalent before the search, and is the sort of inmate that would normally be admitted to general population housing.

### 1. Reasonable Suspicion

Eastwood contends she is entitled to summary judgment on Dodson's strip search claim because she had reasonable suspicion to perform a strip search.

The Tenth Circuit held that strip-searches of pretrial detainees are permissible when officers possess reasonable suspicion that the detainee has concealed weapons, drugs or contraband. *Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008). "Reasonable suspicion for a search is a minimum level of objective justification based on the totality of the circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense." *Id.* (quotations omitted). However, an officer must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Stearns v. Clarkson*, 615 F.3d 1278, 1287 (10th Cir. 2010).

Here, the undisputed facts establish that:

- Dodson was going to be admitted to the general population;
- Drug paraphernalia and a Lortab were found in Dodson's purse;
- Dodson was belligerent and uncooperative during the booking process.

These facts formed the basis for a "reasonable suspicion" that Dodson might have concealed drugs on her person, and supported a conclusion that the strip search was necessary to ensure that contraband was not brought into the facilities. Accordingly, Eastwood is entitled to summary judgment against Dodson on her claim that the strip search was unlawful.

### 2. Constitutionality of Blanket Strip Search Policy

Eastwood and the Sheriff deny the jail has a policy of mandatory strip searches. However, Eastwood argues that even if the strip search occurred as part of a mandatory policy, it was not unconstitutional. "The Fourth Amendment prohibits only unreasonable searches." *Bell v. Wolfish*, 441 U.S. 520, 558 (1979), and "while an inmate's right to privacy 'does not vanish altogether,' it 'must yield to the penal institution's need to maintain security.'" *Farmer v. Perrill*, 288 F.3d 1254, 1259 (10th Cir. 2002) (internal quotation marks omitted).

The Supreme Court directly addressed the constitutionality of blanket strip search policies in *Florence v. Board of Chosen Freeholders of Burlington*, 566 U.S. 318 (2012). In *Florence*, the plaintiff had been stopped by a New Jersey state trooper. *Id.* at 323. During the stop, the trooper learned of an outstanding 2003 bench warrant that—unknown to the trooper—had mistakenly remained active in a law enforcement database despite plaintiff's having paid the underlying fine. *Id.* He was taken to the Burlington County Detention Center, and held for six days, and then to the Essex County Correctional Facility, where he was held for two days, until charges against him were dismissed. *Id.* at 323-324. Pursuant to blanket strip search policies, both facilities required him to submit to a strip search. *Id.* Subsequently, the plaintiff sued both facilities alleging violation of his rights under 42 U.S.C. §1983. The district court granted the plaintiff's motion for summary judgment on the unlawful search claim, concluding that any policy of "strip searching" nonindictable offenders without reasonable suspicion violated the Fourth Amendment. *Id.* at 325. A divided panel of the Third Circuit Court of Appeals reversed, concluding that the procedures struck a reasonable balance between inmate privacy and the security needs of the jails. *Id.* The plaintiff appealed the decision to the Supreme Court. *Id.*

The Supreme Court reversed the Court of Appeals, stating that, "in addressing this type of constitutional claim courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security," *Id.* at 322-323. Citing *Atwater v. City of Lago Vista*, 532 U.S. 318, 347 (2001), it stated:

> Officers who interact with those suspected of violating the law have an "essential interest in readily administrable rules." The officials in charge of the jails in this case urge the Court to reject any complicated constitutional scheme requiring them to conduct less thorough inspections of some detainees based on their behavior, suspected offense, criminal history, and other factors. They offer significant reasons why the Constitution must not prevent them from conducting the same search on any suspected offender who will be admitted to the general population in their facilities. The restrictions suggested by petitioner would limit the intrusion on the privacy of some detainees but at the risk of increased danger to everyone in the facility, including the less serious offenders themselves.

*Id.* at 338. The Court concluded that the search procedures at the two facilities "struck a reasonable balance between the needs of the institutions." *Id.* at 339.

In *Hyberg v. Enslow*, 801 Fed. Appx. 647 (10th Cir. 2020), a state prisoner who was housed at the Sterling Correctional Facility and worked at the Colorado Correctional Industries Seating Factory, filed a pro se lawsuit challenging the facility's practice of subjecting him to strip searches when he left the Seating Factory at the end of his shift. The appellate court acknowledged that "[t]he scope of the searches here was undeniably invasive" and "[t]here can be no doubt that a strip search is an invasion of personal rights of the first magnitude." *Id.* at 650. Nonetheless, it concluded that "there are obvious security concerns inherent when an inmate will be placed in the general prison population, and because the inmate was returning to general population when he was subjected to the end of his shifts at the Seating Factory, "[t]here were therefore legitimate security interests served by the searches." *Id.* It further noted that the searches were conducted "in

a uniform manner, following routine protocol, in a designated area with limited access for other inmates and staff." *Id.*[7]

The Court concludes that even if—as Dodson alleges—the Jail had a blanket practice of strip searching all arrestees as part of the process of booking them into the general population of a detention facility, the practice is constitutionally permissible. Accordingly, Eastwood is entitled to summary judgment on Dodson's claim that the strip search violated §1983 and the Fourteenth Amendment.

### 3. Qualified Immunity

Eastwood also argues that she is entitled to qualified immunity from liability on Dodson's unlawful strip search claim. Law enforcement officers "are entitled to qualified immunity under §1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Dist. of Columbia v. Wesby*, 138 S.Ct. 577, 589 (2018) internal citation omitted). "Clearly established," in turn, "means that, at the time of the officer's conduct, the law was sufficiently clear that every 'reasonable official would understand that what he is doing' is unlawful." *Id.* "In other words, existing law must have placed the constitutionality of the officer's conduct '"beyond debate."'" *Id.* (citations omitted). This

---

7 Recently, in *Hinkle v. Beckham County Board of County Commissioners*, the Tenth Circuit Court of Appeals addressed a challenge to a Beckham County, Oklahoma, policy that mandated a body-cavity strip search of all detainees before any decision was made about where particular detainees would be housed in the jail's general population. 962 F.3d 1204 (10th Cir. 2020). Under the policy, all detainees were strip searched before they were even booked. *Id.* at 1235. The appellate court observed that in *Florence*, the Supreme Court "repeatedly stressed that the strip search comes *after* the facility determines the detainee 'will be' placed in general population" and had commented that "'[t]his case does not require the Court to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees." *Id.* at 1237 (emphasis added). The court concluded that "because the jail officials never decided that Hinkle 'w[ould] be' housed at the county jail, no one had any reason to fear that Hinkle might have secreted contraband that he could take into the jail's general population." *Id.* at 1239.

demanding standard protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S 335, 341 (1986).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent," *i.e.*, "[t]he rule must be 'settled law.'" *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (*per curiam*). To be "settled law," in turn, it must be dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that 'every reasonable official' would know." *Wesby*, *supra*, 138 S. Ct. at 590.

The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him or her. The rule's contours must be so well defined that it is "clear to the reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v, Katz*, 533 U.S. 194, 202 (2001).

In this case, Dodson was bound for general population, where she would (and did) interact with other inmates. Thus, under *Florence*, the strip search passed constitutional scrutiny even without any specific knowledge about Dodson. Additionally, however, Eastwood had reason to believe Dodson could be carrying contraband based on her belligerent and uncooperative behavior, the presence of contraband in her purse, and her resistance to Eastwood's efforts to handcuff her.

Accordingly, Eastwood is entitled to qualified immunity on Dodson's unlawful strip search claim.

### B. Dodson's Excessive Force Claim

#### 1. Reasonableness of Use of Force

Before *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015), claims of excessive force brought under the Fourteenth Amendment were governed by a subjective standard. In other words, the Fourteenth Amendment was said to apply to "[f]orce inspired by malice or by unwise, excessive zeal amounting to an abuse of official power that shocks the conscience." *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003). However, in *Kingsley*, the Supreme Court held that an objective—rather than a subjective—standard applies in cases involving a pretrial detainee's claim of excessive force,. *Id.* at 397. In so ruling, it stated:

> A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight . . . and must also account for the legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in th[e] judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 397 (internal citations and quotation marks omitted).

*Id.* Factors to be considered in making this determination include "the reasonableness or unreasonableness of the force used; the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer, and whether the plaintiff was actively resisting." *Id.* (internal citations omitted).

Although Dodson's Amended Complaint asserted a Fourteenth Amendment §1983 claim, it omitted the Fourth Amendment claim.[8] However, in response to Eastwood's argument that

---

[8] The original Complaint included both a Fourth Amendment and a Fourteenth Amendment Claim. Doc. 2, Complaint at 10. In her response to Eastwood's summary judgment motion, Dodson asserts the Fourteenth Amendment "only serves to make the Fourth Amendment applicable to the

Fourteenth Amendment claims are still governed by a subjective standard, she argues that either the Fourth or Fourteenth Amendment could apply to her claim. The Court rejects this argument, as Dodson voluntarily withdrew her Fourth Amendment claim.

Moreover, the incident giving rise to this claim occurred pre-*Kingsley*, and, therefore, pre-*Kingsley* standards apply for the purposes of evaluating Eastwood's claim of qualified immunity. *See*, *i.e.*, *Austin v. Hamilton*, 945 F.2d 1152, 1162 (10th Cir. 1991) (stating that the court's "holding in this opinion that fourth amendment protections persist *post-arrest* obviously does not reflect law clearly established at the time of the events involved here."). Accordingly, a subjective standard applies to the evaluation of Dodson's excessive force claim.

The Fourteenth Amendment protects pretrial detainees against "arbitrary governmental action, taken without due process[.]" *Porro v. Barns*, 624 F.3d 1322, 1326 (10th Circuit 2010). *See also*, *Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003) ("Force inspired by malice or by unwise, excessive zeal . . . amounting to an abuse of official power that shocks the conscience may be redressed under the Fourteenth Amendment.)"

At least one disputed material fact precludes the Court from entering summary judgment against Dodson on her use of force claim. Specifically, Eastwood claims that she was, at a minimum, five feet away from Dodson when she deployed the JPX. Dodson, in contrast, contends that Eastwood was holding the JPX not more than 10 inches away from her face.

Eastwood argues there is no "genuine dispute" of fact because "Dodson fails to show how her admitted fuzzy memory creates such a genuine dispute," and she urges the Court to "examine

---

States through the Due Process clause." Doc. 122 at 19, n. 1. However, in *Kingsley*, the Supreme Court read the Fourteenth Amendment to establish substantive rights to pretrial detainees, stating that "in the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not "'rationally related to a legitimate nonpunitive governmental purpose'" or that the actions "'appear excessive in relation to that purpose.'"

the facts as presented by Eastwood and confirmed by other witnesses and conclude that Eastwood engaged in no constitutional violation." Doc. 131 at 10-11.

The Court, however, declines to do so. Here, Dodson and Eastwood were the only two witnesses in the restroom. Davis, who was outside the door, could not actually see what was going on or where Eastwood was standing in relation to Dodson. Because the distance between Eastwood and Dodson remains a disputed material issue of fact, Eastwood's Motion for Summery Judgment on the excessive force claim must be denied.

### 2. Qualified Immunity

As previously noted, law enforcement officers are entitled to qualified immunity under §1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." *Wesby*, *supra.*, 138 S.Ct. at 589. The same fact dispute that defeats Eastwood's motion for summary judgment on the excessive force claim —*i.e.*, the conflicting testimony about the distance between Eastwood and Dodson—also precludes summary judgment on her qualified immunity claim. Accordingly, Eastwood's qualified immunity motion is denied.

### C. Denial of Medical Care Claim

To prevail on her claim against Eastwood for denial of medical care, Dodson "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Strain v. Regalado*, 977 F.3d 984, 989 (10th Cir. 2020).

It is undisputed that:

- Eastwood turned the shower on, sprayed Dodson with water to try to flush her eye out, and instructed Dodson to wash any remaining residue from her eye;

- Dodson refused, at that time, to allow Eastwood to finish washing out all the spray;

- Eastwood gave Dodson (at a minimum) a jug of water, and placed her back in the detoxification cell, which was in the booking area and easily visible to staff;

- Throughout the night, Eastwood and Davis checked on Dodson, and before Davis left his shift at 7:00 a.m., he asked Dodson if she needed anything, and she replied that she did not.

In light of this evidence, the Court concludes that Dodson has failed to present facts which—even if taken as true—support her claim that Eastwood failed to provide necessary and proper medical treatment in deliberate indifference to her medical needs. Accordingly, Eastwood is entitled to summary judgment on Dodson's claim against her for denial of medical care.

### D. Dodson's Punitive Damages Claim

Eastwood argues that she is entitled to summary judgment on Dodson's punitive damage claim, because there is no evidence that Eastwood deliberately intended to cause Dodson any harm. However, because a disputed, material issue of fact remains regarding Eastwood's distance from Dodson when she deployed the JPX, her motion for summary judgment on the punitive damage claim must be denied.

### V. Conclusion

For the foregoing reasons, Eastwood's Motion for Summary Judgment is granted in part and denied in part. Specifically, summary judgment in favor of Eastwood is granted with respect to Dodson's unlawful search and denial of medical care claims, and is denied with respect to Dodson's excessive force and punitive damages claims.

ENTERED THIS 2nd day of September, 2021.

*[Signature: Terence Kern]*
**TERENCE KERN**
**United States District Judge**